No. 17-3716

# In the United States Court of Appeals
## for the Third Circuit

JERYL TURCO,

*Plaintiff-Appellee,*

v.

CITY OF ENGLEWOOD, NEW JERSEY,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of New Jersey
Case No. 2:15-cv-03008 (Hon. Susan D. Wigenton)

## BRIEF OF PLAINTIFF-APPELLEE JERYL TURCO

EDWARD L. WHITE III*
ERIK M. ZIMMERMAN**
AMERICAN CENTER FOR LAW
  AND JUSTICE
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel.: 734-680-8007
Email: ewhite@aclj.org


* Admitted to Third Circuit Bar
** Not admitted in this jurisdiction

FRANCIS J. MANION*
  *Lead Counsel*
GEOFFREY R. SURTEES**
AMERICAN CENTER FOR LAW
  AND JUSTICE
6375 New Hope Road
New Hope, Kentucky 40052
Tel.: 502-549-7020
Email: fmanion@aclj.org

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE .................................................................2

I.    Plaintiff Jeryl Turco ........................................................... 2

II.   Bread of Life Protestors ..................................................... 5

III.  The Ordinance .................................................................... 8

IV.   Prior efforts by the City to deal with claims of violence,
      harassment, and assault at the abortion clinic ............................ 10

V.    Application and impact of the Ordinance on Turco's speech ........ 12

VI.   Impact of the Ordinance on protest activities................................. 18

SUMMARY OF ARGUMENT ................................................................19

ARGUMENT ......................................................................................21

I.    The Ordinance violates the First Amendment under
      *McCullen* and *Bruni* ........................................................21

      A.    Standard of review ............................................................21

      B.    Intermediate scrutiny is a rigorous standard that the
            City must satisfy ...............................................................21

      C.    The Ordinance substantially burdens Turco's speech.......... 24

D.    The mere size of the buffer zone is not dispositive ............... 33

E.    The Ordinance is not narrowly tailored ................................. 36

    1.    The breadth and scope of the Ordinance is contrary to the demands of narrow tailoring ............. 37

    2.    The City's consideration of other jurisdictions ............ 41

    3.    Lack of enforcement and prosecutions under existing laws ................................................................ 42

    4.    Police presence not seriously pursued ......................... 48

    5.    No injunctions pursued ................................................ 52

    6.    Interests of the City and (in)effectiveness of the Ordinance ..................................................................... 55

II.    The Ordinance is facially overbroad and therefore void ............... 59

III.    The City is not entitled to summary judgment ............................. 65

CONCLUSION ..................................................................................... 67

COMBINED CERTIFICATIONS ........................................................ 68

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Mukasey,*
   534 F.3d 181 (3d Cir. 2008) ............................................................. 63, 64

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, 252 (1986) ...................................................................... 21

*Englewood. Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.,*
   482 U.S. 569 (1987) ....................................................................... 60, 62

*Bruni v. City of Pittsburgh,*
   824 F.3d 353 (3d Cir. 2016) ......................................................... *passim*

*Coates v. City of Cincinnati,*
   402 U.S. 611 (1971) ............................................................................. 63

*Doe v. Gov. of New Jersey,*
   783 F.3d 150 (3d Cir. 2015) ................................................................. 30

*Fireman's Ins. Co. v. DuFresne,*
   676 F.2d 965 (3d Cir. 1982) ................................................................. 21

*Free Speech Coal., Inc. v. AG of the United States,*
   677 F.3d 519 (3d Cir. 2012) ................................................................. 61

*Frisby v. Schultz,*
   487 U.S. 474 (1988) ............................................................................. 39

*Hague v. C.I.O.,*
   307 U.S. 496 (1939) ............................................................................. 51

*Hill v. Colorado,*
   530 U.S. 703 (2000) ......................................................... 29, 30, 31, 63

*J.S. v. Blue Mt. Sch. Dist.,*
   650 F.3d 915 (3d Cir. 2011) (en banc) ................................................ 21

*McCullen v. Coakley,*
   134 S. Ct. 2518 (2014) ............................................................... *passim*

*N.J. Citizen Action v. Edison Twp.,*
   797 F.2d 1250 (3d Cir. 1986) .............................................................. 22

*NAACP v. Alabama,*
   377 U.S. 288 (1964) ............................................................................ 59

*Packingham v. North Carolina,*
   137 S. Ct. 1730 (2017) ........................................................................ 23

*Pichler v. UNITE,*
   542 F.3d 380 (3d Cir. 2008) ............................................................... 21

*Reynolds v. Middleton,*
   779 F.3d 222 (4th Cir. 2015) ........................................................ 24, 40

*Riley v. National Fed'n of Blind,*
   487 U.S. 781 (1988) ........................................................................... 43

*Schneider v. State,*
   308 U.S. 147 (1939) ..................................................................... 43, 56

*Startzell v. City of Philadelphia,*
   533 F.3d 183 (3d Cir. 2008) ............................................................... 22

*Thornhill v. Alabama,*
   310 U.S. 88 (1940) ............................................................................. 60

*United States v. Playboy Entm't Grp., Inc.,*
   529 U.S. 803 (2000) ..................................................................... 22, 33

*United States v. Stevens,*
   559 U.S. 460 (2010) ..................................................................... 59, 62

*United States v. Williams,*
  128 S. Ct. 1830 (2008) ........................................................ 64

**Statutes**

28 U.S.C. § 1291 ............................................................... 1

28 U.S.C. § 1331 ............................................................... 1

28 U.S.C. § 1367 ............................................................... 1

Mass. Gen. Laws, ch. 266, § 120E½(d) ............................. 10, 34

N.J.S.A. § 2C:12-1 .......................................................... 42

N.J.S.A. § 2C:33-2 .......................................................... 42

N.J.S.A. § 2C:33-4 .......................................................... 42

N.J.S.A. § 2C:33-7 .......................................................... 43

N.J.S.A. § 39:4-34 ...................................................... 15, 17

N.J.S.A. § 26:2H-2 .................................................. 9, 38, 61

N.J.S.A. § 40:55D-66.2 ................................................ 9, 38

N.J.S.A. § 40:55D-66.2(a) ....................................... 38, 60, 63

## INTRODUCTION

When this Court last considered an abortion buffer zone law, such as the one at issue in this case, it observed: "This case calls for nothing more than a straightforward application of *McCullen* [*v. Coakley*]—the Ordinance imposes the same kind of burden on speech, the same less burdensome options are available, and the City has similarly failed to try or to consider those alternatives to justify its Ordinance." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 n.17 (3d Cir. 2016).

In the words of Yogi Berra, "It's *déjà vu* all over again."

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state claims under 28 U.S.C. § 1367. The court granted summary judgment to Plaintiff on all claims, federal and state. [Ja2-3.] Plaintiff filed a notice of appeal on December 13, 2017. [Ja1.] This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly held that Defendant City of Englewood's Ordinance, creating no-speech buffer zones around health care and transitional facilities, was not narrowly tailored, rendering it unconstitutional under the United States and New Jersey Constitutions.

2.    Whether the district court correctly held that the Ordinance was facially overbroad and therefore unconstitutional.

3.    Whether the district court correctly denied the City's motion for summary judgment on the grounds that the Ordinance is not narrowly tailored and is facially overbroad.

## STATEMENT OF THE CASE

### I.    Plaintiff Jeryl Turco

Plaintiff Jeryl Turco is a volunteer pro-life advocate who has a deeply-held religious belief that abortion takes the life of an innocent child and is, therefore, immoral. [Verified Complaint, Ja265.] Turco is compelled by her conscience to peacefully express her religious views concerning abortion in traditional public forums in Englewood, especially on the public sidewalk in front of Metropolitan Medical

Associates, an abortion clinic located at 40 Engle Street (hereinafter "MMA" or "clinic"). [Ja263, 265.] This sidewalk runs parallel to Engle Street in front of the abortion clinic and adjacent properties. [Ja265.] A door is located near the westernmost end of the front of the building, while a driveway to an employee parking lot is located near the easternmost end of the front of the building. [Ja265, 269.]

The public sidewalk in front of the abortion clinic is the only location where Turco can effectively communicate with people going into or leaving the abortion clinic, her intended audience. [Ja265.] For over seven years now, Turco has regularly used the sidewalk in front of or adjacent to the abortion clinic each Saturday morning to speak with individuals heading to or from the abortion clinic and to offer them literature and a rosary. *Id.*

Turco is motivated by her faith to speak with individuals heading to or from the abortion clinic in a friendly, peaceful, conversational, and non-confrontational manner. [Ja262.] When using the sidewalk near the abortion clinic, Turco has been, and desires to continue to be, a *sidewalk counselor* who extends compassion and assistance to women who are considering, or recovering from, having an abortion. [Ja266.] She does

3

not consider herself to be a "protestor" or "demonstrator", as yelling or being confrontational or aggressive would be contrary to, and would interfere with, her intended method of advocacy. *Id.* Turco also does not obstruct pedestrian use of the sidewalk or block the clinic's entrance. *Id.*

Turco considers it essential to maintain a caring demeanor, a calm tone of voice, and eye contact during her exchanges with individuals heading to or from the abortion clinic. *Id.* She believes that this method of expression is a much more effective means of dissuading women from having abortions than confrontational methods like shouting. *Id.* Things that Turco has often said to women who are heading toward the abortion clinic include: "Would you like a rosary?," "Here is some information about fetal development," "God loves you and your baby," "We can help you," "We are praying for you," "It's never too late to change your mind," and "There is a center across the street that can help you" (referring to a crisis pregnancy center). *Id.*

Before the Ordinance at issue in this case was enacted, women would often walk along the sidewalk in front of nearby buildings before entering the clinic, and would take the same route after exiting. [Ja271.] As such, Turco often had the opportunity to hand literature

4

and rosaries to women who were interested in receiving them, and to engage in discussions in a conversational tone with them, as they walked along the sidewalk up to, or leading from, the front door. *Id*.

## II.    Bread of Life Protestors

While MMA has been the site of protests and other anti-abortion expression such as prayer and sidewalk counseling for decades, a marked change in the type of such activity occurred in October of 2013, connected with a group called the "Bread of Life," which led to calls for a response by the City. [Algrant Cert., Ja70; Ja378-80; O'Keefe Cert., Ja211-12; Gray Depo., Ja321, 324.]

In late October 2013, following the first appearance of the Bread of Life group, the City began receiving reports from clinic doctors, employees, volunteer patient escorts, and its own police officers that the Bread of Life group was engaging in allegedly unlawful activities, including harassment, verbal and physical intimidation, threatening, and obstructing of patients.  [Algrant Cert., Ja70-71, 73; Algrant Depo., Ja329, 378-80; O'Keefe Cert., Ja212-13; O'Keefe Depo., Ja334, 336.]

The group would show up at the clinic on Saturdays, for a few hours at a time. [Turco Dec., Ja294; O'Keefe Depo., Ja335; Gray Depo.,

Ja320.] Bread of Life members would not only harass patients, but also sidewalk counselors, including Turco. [Turco Depo., Ja311; Garrett Depo., Ja494; Turco Dec., Ja293-94.]

According to City Council President Lynne Algrant, although excessive noise was certainly one of the problems created by the Bread of Life group, the core problems the group's activities created were "harassment, intimidation, obstruction and even violence." [Algrant Depo., Ja329.] The Chief of Police described the behavior as "physically threatening and obstructionist." [O'Keefe Cert., Ja213.] The Chief drew a distinction between the behavior of the Bread of Life members and that of people like Turco, whose behavior he characterized as "low-key and respectful." [O'Keefe Cert., Ja211; O'Keefe Depo., Ja334.] Bread of Life protestors would gather at 40 Engle Street only on some Saturdays, from approximately 8:00 am to 11:00 am. [Algrant Cert., Ja73; Turco Dec., Ja294; Gray Depo., Ja320.]

The issue of the Bread of Life group's activities was first presented to the Englewood City Council at its October 8, 2013 meeting. [Ja103.] Dr. Bruce Tisch, a physician at MMA, read a prepared statement to the council regarding "escalating incidents" at 40 Engle Street, and

6

requested that the council address the issue. *Id*. The statement complained about the activities of the Bread of Life group, describing those activities as obstructionist, harassing, excessively loud, and violative of existing city ordinances and the federal Freedom of Access to Clinic Entrances ("FACE") statute. [Ja345-46.] Eight doctors signed the statement.

At the November 12, 2013 City Council meeting, Dr. Tisch publicly addressed "the decided escalation of the protests," and submitted another statement, asking the City Council to find a way to protect "the constitutional rights of the agitators," while the protecting the right to "the safety of medical care." [Ja111; Ja343.] In addition to Tisch, the clinic's attorney and another MMA doctor also publicly addressed the City Council. [Ja111.]

By the end of December 2013, City Council President Algrant received a copy of a Massachusetts buffer zone statute from a senior attorney with the New York City law department—the same statute subsequently struck down in *McCullen v. Coakley*, 134 S. Ct. 2518 (2014). [Ja349-50.] The attorney noted that the First Circuit "affirmed

the legality" of the law. *Id*. Algrant replied, "This is a great idea!" [Ja351.]

A month later, Algrant informed the MMA clinic escort team that the City had decided to amend existing ordinances to create buffer zones around all medical facilities in the City as the solution to the problems caused by the Bread of Life group at MMA. [Ja354.]

## III. The Ordinance

The Ordinance was adopted on March 18, 2014, two months after *McCullen* was argued. [Dacey Depo., Ja362.] The Ordinance amended Section 307-3 of the City's Disorderly Conduct ordinance which addressed "Obstruction of Health Care Facilities and Transitional Facilities." [Ja46.] The prior ordinance prohibited the obstruction of access to health care and transitional facilities as well as interfering with, impeding, or preventing any person seeking access to such facilities. *Id*. That law did not ban any speech *per se*.

The City never prosecuted *anyone*, including members of the Bread of Life group, for violating the previous ordinance (or even issued a citation); nor did the City prosecute anyone for violating any other

state or local law for any conduct at 40 Engle Street. [Ja288.][1] As the district court found, and the City cannot dispute, "Defendant did not prosecute any protestors for activities taking place on the sidewalk outside of the Clinic in the five years prior to the adoption of the Ordinance." [Ja12-13.]

With the exception of the definitions and the size of the buffer zones created thereunder, the language of the Ordinance adopted on March 18 is *word-for-word* the language of the Massachusetts statute unanimously struck down by the Supreme Court in *McCullen*:

> A.    Definitions. As used in this section, the following terms shall have the meanings indicated:
>
> (1) "health care facility" — as set forth in N.J.S.A. 26:2H-2.
> (2) "transitional facility" — Community residences for the developmentally disabled and community shelters for victims of domestic violence as those terms are defined in N.J.S.A. 40:55D-66.2.
>
> B.    Within the City of Englewood, no person shall knowingly enter or remain on a public way or sidewalk adjacent to a health care facility or transitional facility within a radius of eight feet of any portion of an entrance, exit or driveway of such facility or within the area within a

---

[1] Defendant's complete admissions on this point were inadvertently not included in the Joint Appendix, but are part of the record in the court below. *See* Defendant's Answers to Interrogatories, Ex. C to Plaintiff's Motion for Summary Judgment, ECF Doc. 43-6, pp. 17-19.

> rectangle created by extending the outside boundaries of any
> entrance, exit or driveway of such facility in straight lines to
> the point where such lines intersect the sideline of the street
> in front of such entrance, exit or driveway.

[Ja260.] *Compare with McCullen*, 134 S. Ct. at 2526 (quoting former Mass. Gen. Laws, ch. 266, § 120E½(b)). *See* Addendum A.

Like the Massachusetts buffer zones, the Englewood zones only apply during a "facility's business hours," and the area must be "clearly marked and posted." *Id.* at 2567; Ja260, Section C. Both laws contain *identical* exceptions. *See McCullen*, 134 S. Ct. at 2567; Ja260, Section(B)(1)-(4).

For these reasons, the City's assertion that it is "manifestly not the case" that the statute struck down in *McCullen* "contained language identical to the present Ordinance" is incorrect. City Br. at 22; Ja6. The text of the two laws speak for themselves.

## IV. Prior efforts by the City to deal with claims of violence, harassment, and assault at the abortion clinic

Prior to the adoption of the Ordinance in March 2014, the City increased police patrols at 40 Engle Street in an effort to deal with the claims of violence, harassment, and assault by the protestors. [Ja285.] The police continued to ramp up their presence "as the complaints

10

increased." [O'Keefe Depo., Ja334.] When an officer was present, things were "significantly different." [O'Keefe Depo., Ja339.] Police presence would have a "calming [e]ffect." [Algrant Depo., Ja58-59.] A police officer on site "was able to arrest people on the spot . . . [and] if he saw a violation of the law, he was in a position to enforce it." [O'Keefe Depo., Ja339.]

Despite the undisputed effectiveness of police presence, the City Manager, Timothy Dacey, never undertook an analysis of how much it would have cost the City to maintain a police presence at 40 Engle Street for a few hours on one day a week, and when asked about the idea, said, "No, because we do not provide individual police coverage to businesses in the city. I wouldn't consider doing that." [Dacey Depo., Ja361.]

The police would receive complaints from "passersby" [O'Keefe Depo., Ja334], and the City investigated at least six complaints based on incidents at 40 Engle Street prior to March 2014. [Ja366-74.] Two of the reports indicate "40 Engle St." as the "Victim's Home Address." [Ja369, 371.]

Finally, there is no dispute that neither the City nor the clinic ever pursued an injunction against one or more members of the Bread of Life group, despite the numerous reports compiled by the clinic's escort team and presented to the City. [Ja165-193.] Nor is there any evidence that the City considered *any* legislative proposals to deal with the activities at the clinic other than the Massachusetts law eventually struck down by the Supreme Court.

## V.    Application and impact of the Ordinance on Turco's speech

One month after the Ordinance was adopted, Englewood officials began marking out buffer zones around covered facilities throughout the City. In an email from the Chief of Police, Larry Suffern, to Dacey, Suffern wrote, "We have marked out buffer zones at several of the medical facilities in town. We will continue to identify the other medical facilities and mark out buffer zones." [Ja469.] In that same email, Suffern forwarded an email to Dacey indicating that buffer zones had been marked out at six locations within Englewood, including at 40 Engle Street. [Ja469-470.] The City's contention that Plaintiff has presented "no evidence" of the City attempting to enforce the Ordinance at locations other than MMA is therefore wrong. City Br. at 17. In

12

marking out buffer zones at facilities other than the abortion clinic, the City clearly intended to limit speech at numerous locales.

Contrary to the City's repeated claims, the application of the Ordinance to 40 Engle Street does not create a mere 8 foot buffer zone outside the abortion clinic. First, there is not *one* buffer zone at 40 Engle Street, *but four*. In front of *both* the clinic's doorway and driveway are (1) a *semicircular* zone that extends eight feet out from both sides of the doorway and driveway, and (2) a *rectangular* zone that extends from the sides of the doorway and driveway all the way to the street. A photograph attached to Turco's declaration shows the proximity between the clinic's doorway and driveway and the zones demarcated in front of each:



[Ja306; *see also* Ja302, Ja304.][2]

Second, because the Ordinance prohibits Turco, and those similarly situated, from entering a buffer zone during a clinic's operating hours, Turco cannot access the area of the sidewalk *between* the two zones unless she crosses the street from the other side of the

---

[2] The Joint Appendix does not reproduce in color the photographs contained in Turco's Declaration and the exhibits attached thereto, as they were presented to the district court. For ease of reference, Turco's Declaration and exhibits have been reproduced in color in Addendum B.

clinic. Jaywalking in this fashion, however, violates New Jersey law. *See* N.J.S.A. § 39:4-34.

Third, combining the two zones in front of the clinic's doorway and driveway, together with the largely inaccessible area between the two, the entirety of the sidewalk is effectively closed off to Turco when she goes to 40 Engle Street to engage in sidewalk counseling. As the district court described the lay of the land:

> The buffer zone extends eight feet to the left and eight feet to the right of the Clinic's doorway or driveway down to the street. As a result, Plaintiff and others similarly situated are excluded from approximately twenty-four feet on either end of the Clinic, or forty-eight feet in total of the public sidewalk outside the Clinic.

[Ja6.][3]

As Turco testified, the numerous zones and lines that divvy up the sidewalk at 40 Engle Street create a veritable "obstacle course" she is forced to navigate when sidewalk counseling:

> The reality of the Englewood buffer zone is you have 8 feet on one side of the door . . . and then you have 8 feet on the other side of the door. And then you have a driveway, and then you have 8 feet on that side, and 8 feet on the other side

---

[3] The district court's calculation assumes that the width of the clinic's doorway and driveway are each 8 feet. [Algrant Depo., Ja330; Ex. I to Plaintiff's Motion for Summary Judgment, 86:1-5, ECF Doc. 43-10.]

of the driveway. So it's like an obstacle course to try and talk to these girls.

[Turco Depo., Ja312.]

Thus, instead of being able to walk in a normal fashion alongside women she tries to speak with, from the beginning of that conversation to the entrance of the clinic (as she was able to do before adoption of Ordinance), the zones require that Turco repeatedly interrupt her close conversations to navigate the multitudinous do-not-cross lines painted on the public sidewalk:

> . . . you have to interrupt your flow of walking because they're not going to walk with you right along the curb. They're going to walk[] . . . normally down a sidewalk. So I am walking normally down a sidewalk. As soon as I hit even that semicircle, I have to begin walking toward the street, then walk into the street, and then gradually, during the semicircle get back.

[Turco Depo., Ja313].

Moreover, when Turco walks out into the street, in order to *attempt* to keep conversing with a woman walking towards the clinic entrance, she does so at her physical and legal peril. The one-way street in front of the clinic is "often a busy road" [Turco Dec., Ja300], and according to New Jersey law, "[w]here sidewalks are provided," as is the

16

case at 40 Engle Street, "it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway." N.J.S.A. § 39:4-34.

In addition, cars are often parked along the street outside the clinic, and during the winter months, piles of snow alongside the street make it burdensome, if not impossible, for her to walk around the zones. [Turco Dec., Ja300.] Turco must navigate all these barriers, and more[4] simply to engage in peaceful and otherwise fully-protected constitutional speech in a traditional public forum during the very brief window of time that she has to communicate with her intended audience.

The net impact of the Ordinance on Turco's speech at 40 Engle Street is that her "counseling efforts have been considerably hampered," and her "ability to engage in peaceful conversations, and to offer literature and/or a rosary to interested individuals passing by on the public sidewalk, has been severely restricted." [Turco Dec., Ja298.] The Ordinance, and the zones created under it, hinder her "ability to initiate

---

[4] While trying to navigate the zones, Turco must also avoid the commotion cause by the Bread of Life members [Turco Depo., Ja311, 314; Turco Dec., Ja293-94; Garrett Depo., Ja494], as well as contend with the interference caused by the conduct of the escorts [Turco Dec., Ja299].

the close, personal conversations that [she views] as essential to sidewalk counseling and also significantly hampers [her] ability to offer literature and rosaries to individuals on the public sidewalk." *McCullen*, 134 S. Ct. at 2535.[5]

## VI.    Impact of the Ordinance on protest activities

As explained herein, whether the Ordinance has been effective in quelling the activities of the Bread of Life group is largely irrelevant. Nonetheless, the Ordinance has failed to "lessen [the] type of behavior by the Bread of Life people," and, if anything, things have become worse. [Garrett Depo., Ja495.]

Indeed, in October 2014, *seven months after the Ordinance was adopted*, the clinic's escort team reported that the "Bread of Life men were back," and that they "were very loud and intimidating to patients." [Ja356.] The team reported that the group had some "younger-looking recruits" and that "this most intimidating group seems to be growing." *Id*. The protestors were "lingering in the buffer zone," and one of the

---

[5] Rosemary Garrett, another sidewalk counselor, does not even try to counsel in front of 40 Engle Street, but rather, as she described it, "I'm down on the corner far away from the building, abortion clinic." [Garrett Depo., Ja494.] She moved away from the clinic on account of the Bread of Life protestors. *Id*.

group's "ring leaders" stopped in the middle of a zone and would not move until the clinic's security guard told him to do so. *Id*.

When this report was brought to Algrant's attention, she admitted, in part, "**The buffer zone doesn't have a lot of teeth as we knew**." [Ja357 (emphasis added).]

## SUMMARY OF ARGUMENT

The district court was correct to grant Plaintiff Jeryl Turco summary judgment and this Court should affirm. The Ordinance at issue is not narrowly tailored to further a substantial governmental interest and it is, moreover, facially overbroad.

The Ordinance was not passed to address the quiet and peaceful activities of sidewalk counselors, like Turco, who speak with women outside the abortion clinic in Englewood. It was adopted to deal with the conduct of a group of abortion protestors who would gather at that same location for a few hours on Saturdays.

Like Massachusetts in *McCullen v. Coakley* (unanimously striking down that state's abortion buffer zone law), the City did not directly target the bad conduct of protestors by means of adopting *focused* legislation, prosecuting wrongdoers under existing laws, maintaining a

19

police presence at the site, or attempting to seek some form of injunctive relief. Instead, the City adopted, almost *verbatim*, the law held eventually unconstitutional in *McCullen*, banning all speech within buffer zones outside numerous facilities in the City.

As applied to the specific location where Turco seeks to counsel women, the multiple zones painted on the sidewalk, pursuant to the Ordinance, create an obstacle course she must navigate to engage in effective close and intimate conversations. The Ordinance totally bans Turco from speaking within multiple zones, and, outside those zones, seriously burdens her speech activities.

There is no material dispute that the Ordinance serves public interests identified by the City. The Ordinance fails, however, to serve those interests in a *narrowly tailored* fashion, as the First Amendment requires.

The breadth and scope of the Ordinance, moreover, renders it facially overbroad.

This Court should affirm the judgment of the district court.

# ARGUMENT

## I.    The Ordinance violates the First Amendment under *McCullen* and *Bruni*.

### A.    Standard of review

Rulings on summary judgment motions are reviewed *de novo*. *J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 925 (3d Cir. 2011) (en banc) (citations omitted). Where, as in this case, the lower court considers cross-motions for summary judgment, "the court construes facts and draws inferences 'in favor of the party against whom the motion under consideration is made.'" *Id.* (quoting *Pichler v. UNITE*, 542 F.3d 380, 385 (3d Cir. 2008)). A party opposing summary judgment, however, must show more than "[t]he mere existence of a scintilla of evidence" for elements on which it bears the burden of production. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Nor may that party "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

### B.    Intermediate scrutiny is a rigorous standard that the City must satisfy.

Three considerations govern whether a restriction on speech satisfies the First Amendment: "(1) whether the speech is 'protected by

the First Amendment'; (2) 'the nature of the forum'; and (3) whether the government's 'justifications for exclusion from the relevant forum satisfy the requisite standard.'" *Startzell v. City of Philadelphia*, 533 F.3d 183, 192 (3d Cir. 2008) (citation omitted).

The City *alone* bears the burden of proving that the Ordinance challenged in this case passes constitutional muster. "When the Government restricts speech, *the Government bears the burden* of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) (citations omitted) (emphasis added). *See also N.J. Citizen Action v. Edison Twp.*, 797 F.2d 1250, 1255 (3d Cir. 1986) ("[W]hen a statute or other government action is alleged to infringe on the exercise of First Amendment rights, the state or municipality bears the burden of demonstrating the constitutionality of the action.").

As the district court observed, and the City does not dispute, the speech at issue in this case is fully protected by the First Amendment, and the Ordinance suppresses speech in a traditional public forum, *i.e.*, public sidewalks. [Ja10.]

Nor do the parties disagree as to the requisite standard to be applied to the Ordinance: intermediate scrutiny. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017) (describing the narrow tailoring analysis under *McCullen* as "intermediate scrutiny"). The decisive question is therefore whether the City has proven that the Ordinance is "narrowly tailored to serve a significant governmental interest." *Bruni*, 824 F.3d at 365 (quoting *McCullen*, 134 S. Ct. at 2534). Such narrow tailoring requires that the government not "burden substantially more speech than necessary to achieve the [government's] asserted interests." *McCullen*, 134 S. Ct. at 2537.

The narrow tailoring requirement is "rigorous and fact-intensive." *Bruni*, 824 F.3d at 372. To meet that requirement, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 134 S. Ct. at 2540. "[T]he City cannot burden [speech] without first trying, or at least demonstrating that it has seriously considered, substantially less restrictive alternatives that would achieve the City's legitimate, substantial, and content-neutral interests." *Bruni*, 824 F.3d at 357.

23

Intermediate scrutiny is no rubber stamp for the government. As the Fourth Circuit held, under *McCullen*, intermediate scrutiny "require[s] the government to present ***actual evidence*** supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument ***unsupported by the evidence*** will not suffice to carry the government's burden." *Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015) (emphasis added).

## C.    The Ordinance substantially burdens Turco's speech.

Like the *McCullen* petitioners, Turco characterizes herself a "sidewalk counselor." [Turco Dec., Ja292.] Sidewalk counselors "*are not protestors,*" like the Bread of Life group, whose activities gave rise to the Ordinance. *McCullen* 134 S. Ct. at 2536. As described by the Court in *McCullen*, sidewalk counselors

> seek not merely to express their opposition to abortion, but to inform women of various alternatives and to provide help in pursuing them. [They] believe that they can accomplish this objective only through personal, caring, consensual conversations. And for good reason: It is easier to ignore a strained voice or a waving hand than a direct greeting or an outstretched arm.

*Id.* at 2536-37.

For close to nine years, Turco has been counseling on the public

24

sidewalk adjacent to 40 Engle Street on Saturday mornings. [Turco Dec., Ja292.] When counseling women, she does so in a friendly, peaceful, conversational, and non-confrontational manner. *Id*.

Like the sidewalk counselors in *McCullen*, Turco believes that the most effective way to interact with women approaching an abortion clinic is "to maintain a caring demeanor, a calm tone of voice, and direct eye contact." 134 S. Ct. at 2527; Turco Dec., Ja292. Sidewalk counselors believe that "confrontational methods such as shouting or brandishing signs . . . tend only serve to antagonize their intended audience." *Id*.; Turco Dec., Ja293.

After the passage of the Ordinance in March 2014, and the creation of the buffer zones at 40 Engle Street, Turco has been significantly hampered in her efforts to counsel women at that site. As described previously, the multitudinous semi-circular and straight lines that crisscross the public sidewalk create an obstacle course for her to navigate while trying to engage women in close and private conversations.

The City claims that all of this is no big deal because the numerous zones and multiple painted lines have not "not prevented her

from communicating with, and even converting, clinic patients." City Br. at 14. That is a *non sequitur*, just as it was in *McCullen*. *See* 134 S. Ct. at 2536 (noting that even *after* the buffer zone law was adopted in Massachusetts, Ms. McCullen was still able to persuade "about 80 women not to terminate their pregnancies.").

There is no dispute that Turco is able to counsel women while they are *outside the buffer zones*. What Turco cannot do, however, is counsel patients *within* several areas of the public sidewalk deemed no-speech zones by the City; nor can she engage patients in "personal, caring, consensual conversations" while trying to run the obstacle course posed by the painted lines. *McCullen*, 134 S. Ct. at 2536. Given the close, private, and intimate conversations sidewalk counselors like Turco wish to engage in, there can be no doubt that such conversations are substantially impeded by the presence of the zones. It is, moreover, "no answer to say that [Turco] can still be 'seen and heard' by women within the buffer zones." *Id.* at 2537.

26

If, for example, Turco is standing to the left of the clinic entrance and sees and wishes to speak with a woman approaching the clinic from the right of driveway (*see* photo, *supra*, at 14), she must either (1) walk through the zones to meet her, which is illegal under the Ordinance, or (2) walk out into the street to meet the woman, which is illegal under New Jersey state law. Upon meeting the woman, Turco cannot walk alongside her as she approaches the clinic entrance because Turco must avoid crossing the multiple lines as she does so, forcing her—*again*—illegally to walk out into the street, in order not to cross the zones, which is also illegal.

Turco only has "seconds" and "inches" to communicate her message, and every second and inch of conversation counts: "The longer I have to speak closely and intimately with women, the better chance I have in effectively sharing my message of hope with them." [Turco Dec., Ja298.] Prior to the Ordinance, she could accompany a woman all the way to the front door, peacefully sharing her message. *Id*. Due to the City's imposition of multiple no-speech zones along the front of the clinic, that is no longer the case.

27

The City points to a photograph of Turco engaging in a close, personal conversation with a woman after the zones were created. City Br. at 10; Ja195. Again, there is no dispute that Turco is able to speak with women when those women are *outside* the zones, but what that photograph perfectly reveals is what Turco is prohibited by the Ordinance from doing *within* the zones, much less while trying to circumnavigate them. [Ja195.] The one-to-one, intimate conversation captured by that photograph cannot take place at a distance of 24 feet, 16 feet, or 8 feet; nor, obviously, can Turco hand someone literature or a rosary at those distances.

In addition, the boisterous protest activities of the Bread of Life group, which gave rise to the adoption of the Ordinance in the first place, interfere with Turco's "ability to communicate" with clinic patients. [Turco Depo., Ja233; Ja309.] That group would not just harass clinic patients but even the sidewalk counselors, like Turco. [Turco Depo., Ja314] Thus, by relegating Turco to the outside of the buffer zones, alongside the highly vocal protestors, her quiet and personal speech risks being drowned out, making it impossible for her to "initiate the close, personal conversations that [she] view[s] as essential to

'sidewalk counseling.'" *McCullen*, 134 S. Ct. at 2535. Indeed, "[i]f all that the women [visiting the clinic] can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled [Turco's] message." *Id.* at 2523.

For these reasons, the City's reliance on *Hill v. Colorado*, 530 U.S. 703 (2000), and the district court opinion in *Bruni v. Pittsburgh*, 2:14-cv-01197 (W.D. Pa. Nov. 16, 2017), *appeal pending,* No. 18-1084 (3d Cir.), is misplaced. City Br. at 20-21. With respect to *Hill*, this Court should place as much weight on that decision as the Supreme Court did in *McCullen*: none. Even though both *Hill* and *McCullen* considered legislation involving buffer zones in the abortion and free speech contexts, the *McCullen* Court *nowhere* relied upon, explained, or applied *Hill*. In fact, except to note that the prior Massachusetts abortion buffer zone law was modeled after the Colorado statute at issue in that case, 134 S. Ct. at 2525, *McCullen* does not even cite the decision.

Moreover, the statute in *Hill* is quite different than the Ordinance here. In *Hill*, the Colorado law created an 8-foot restriction on an *unwanted* physical approach to a person accessing a health clinic. 530 U.S. at 707. The Ordinance, however, creates an *absolute ban* on non-

exempt speech within numerous zones. Thus, in the context of the obstacle course of zones that have been created outside the clinic, Turco cannot cross into a zone to continue speaking one-on-one with a patient, *even if the patient wishes to hear what Turco has to say and invites her to do so. Cf. Doe v. Gov. of New Jersey*, 783 F.3d 150, 155 (3d Cir. 2015) ("[T]he First Amendment protects both the speaker and the recipient of information. . . . The listener's right to receive information is reciprocal to the speaker's right to speak.").

Moreover, while *Hill* suggests that 8 feet can allow for a personal conversation, narrow tailoring is "fact-intensive." *Bruni*, 824 F.3d at 372. Here, while signs can communicate across 8 feet with ease, Turco does not carry signs. And while the Court in *Hill* suggested that protestors "might easily stand on the sidewalk *at entrances*" to hand out literature, 530 U.S. at 730 (emphasis added), Turco is not permitted to do that under the Ordinance, as she could have done prior to its enactment. Finally, while *Hill* suggests that a personal conversation can be had at an 8 feet distance, that statement does not, *as applied in this case*, ring true. The photograph cited by the City itself shows the close and intimate manner in which Turco seeks to engage women, and

*Hill*'s 8 feet distance does not take into account the vocal and vociferous commotion created by the protestors and escorts that indisputably interfere with Turco's message. [Turco Depo., Ja311; Turco Dec., Ja293-94, 99; Garrett Depo., Ja494]. Furthermore, as explained previously, the patchwork of buffer zones often pushes Turco significantly further away from her intended audience than 8 feet.

*McCullen* listed numerous alternatives that Massachusetts could use to further its interests without unduly squelching speech within traditional public fora, and *Hill*'s 8 feet no approach zone was, notably, not among them. 134 S. Ct. at 2539-40. In fact, Massachusetts abandoned a statute similar to Colorado's when it adopted the law struck down by the Court in *McCullen*. *Id*. at 2525.

Additionally, in its application, the Ordinance is more restrictive than the law at issue in the ongoing *Bruni* litigation. In that case there is *one zone* outside the entrance of an abortion clinic. In this case, there are *multiple zones* at the clinic: two sets of semi-circular zones, and two sets of rectangular zones that extend all the way to the street in front of the clinic's entrance and driveway. In *Bruni*, the plaintiffs were able to "walk through the buffer zone in an attempt to reach that person on the

31

other side." [Ja516.] That is not the case here. To reach a person Turco sees on the other side of a zone, she cannot transgress the zone, per the Ordinance, but must walk out into the street (itself, a violation of state law), while walking around parked cars and snowbanks in the winter. Thus, while the plaintiffs in *Bruni* were not "pushed to the other side of the street," *id.*, per Pittsburgh's ordinance, Turco is pushed *into* the street, per Englewood's, when she wants to approach and speak with a woman on the other side of the zones.

In sum, Turco's sworn statements cannot seriously be disputed as a matter of fact or law, *e.g.*, that her "counseling efforts have been considerably hampered" under the Ordinance; that her "ability to engage in peaceful conversations, and to offer literature and/or a rosary to interested individuals . . . has been severely restricted"; that the Ordinance hinders her "ability to initiate the close, personal conversations that [she views] as essential to sidewalk counseling and also significantly hampers [her] ability to offer literature and rosaries to individuals on the public sidewalk." [Turco Dec., Ja298.]

Though Turco's ability to speak has not been *completely eliminated* (neither was Ms. McCullen's), City Br. at 21-22, this does not

change the fact that there is much that Turco ***cannot do*** (*e.g.*, cross a zone to meet a person on the other side); ***must do*** (*e.g.*, walk into the busy street to circumnavigate the zones, in violation of state law); and ***cannot do without difficulty*** (*e.g.*, walk alongside a woman sharing her message in an intimate and private way for the full extent of the sidewalk). *Cf. Playboy*, 529 U.S. at 812 ("It is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree.").

In sum, the City cannot refute Turco's basic contention that the Ordinance imposes on her, and similarly situated persons, "serious burdens" that "compromise [their] ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'" *McCullen*, 134 S. Ct. at 2534. Because the Ordinance "imposes a similar burden as that in *McCullen* . . . it is subject to the same narrow tailoring analysis as the Supreme Court employed in that opinion." *Bruni*, 824 F.3d at 368 n.15.

### D.    The mere size of the buffer zone is not dispositive.

The City argues that the size of the buffer zone weighs dramatically in favor of the Ordinance being narrowly tailored. That is

a red herring. Among *McCullen*'s numerous suggestions as to how Massachusetts could have created a more narrowly tailored statute than its 35-feet buffer zone, 134 S. Ct. at 2537-39, one suggestion is notably absent: ***a smaller zone***. Indeed, *McCullen* does not focus on the size of the buffer zone, but the fact that Massachusetts had created *any buffer zone at all* when it had more narrowly tailored solutions at its disposal than excluding speech in a traditional public forum.[6] It is unsurprising that the Court would not suggest that stifling just a little bit less speech in a traditional public forum would be acceptable when other, non-stifling options are available. As the district court correctly held, "the size of the buffer zone is not dispositive because Defendant has failed to meet its burden and show that the Ordinance is narrowly tailored." [Ja13, n.3.]

This Court, in *Bruni*, emphasized that very point. At issue in *Bruni* was Pittsburgh's abortion buffer zone law that prohibited

---

[6] Tellingly, after *McCullen* was decided, Massachusetts did not impose a smaller buffer zone. Instead, the state created a new law, modeled on FACE, targeting, *inter alia*, anyone "who, by force, physical act or threat of force, intentionally injures or intimidates or attempts to injure or intimidate a person who attempts to access or depart from a reproductive health care facility." Mass. Gen. Laws, ch. 266, § 120E½(d) ("Impeding Access to or Departure from Reproductive Health Care Facility").

congregating or demonstrating within fifteen feet of a hospital or health care facility entrance. 824 F.3d at 357. This Court explained that the size of a buffer zone is "not dispositive," *id.* at 368-69, and noted that "none" of the Supreme Court's four buffer zone precedents "turned solely on the size of the zones." *Id.* at 368. Rather,

> [w]hat matters is the burden on speech that such zones impose, of which size is one but only one feature. Indeed, ***smaller buffer zones are not always better***: *McCullen* struck down a thirty-five foot zone even though *Madsen* had previously upheld a slightly larger zone. *McCullen* never referenced the size of the approved zone in *Madsen* or that the Massachusetts zones were actually smaller. Those cases turned on their distinct factual records, not a simple difference in real estate. *McCullen* emphasized the "serious burdens" that the law imposed on speech by "compromis[ing] petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'" Any difference between the burden on speech in *McCullen* and that here is a matter of degree rather than kind.

*Id.* (internal citations omitted) (emphasis added); *see also id.* at 372 ("No buffer zone can be upheld *a fortiori* simply because a similar one was deemed constitutional.").

In this case, as in *McCullen* and *Bruni*, what matters is not the *size* of the zones the Ordinance creates, but the *burden* they place on free speech activity in traditional public fora. By significantly limiting

35

where and how she can walk and talk with women, the buffer zones seriously hamper Turco's ability to communicate with them.

## E.    The Ordinance is not narrowly tailored.

The City's burden to demonstrate narrow tailoring under intermediate scrutiny is not an easy one to carry. The "sovereign [must] justify its regulation of political speech by describing the efforts it had made to address the government interests at stake by substantially less-restrictive methods or by showing that it seriously considered and reasonably rejected 'different methods that other jurisdictions have found effective.'" *Bruni*, 824 F.3d at 371 (citation omitted).

The City, like the state in *McCullen*, exclaims, "We have tried other approaches, but they do not work." 134 S. Ct. at 2539. That excuse should be given as much weight here as the Supreme Court gave it in *McCullen*: none.

In light of *McCullen*, which unanimously struck down the Massachusetts law that served as the model for the Ordinance at issue in this case, the City cannot possibly prevail on its claim that the Ordinance is narrowly tailored. *McCullen* struck down the buffer zone law because the state had ample alternatives to further its interests

36

without seeking recourse to a ban on speech in traditional public fora. That is precisely the case here.

### 1. *The breadth and scope of the Ordinance is contrary to the demands of narrow tailoring.*

In *McCullen*, the Court held that **even if** other, more narrowly tailored laws would have been ineffective in furthering the state's interests, the Massachusetts buffer zone faced a serious constitutional problem. 134 S. Ct. at 2539. The record before the Court pertained "mainly to one place at one time: the Boston Planned Parenthood clinic on Saturday mornings." *Id*. Nothing in the record revealed that "individuals regularly gather at other clinics, or at other times in Boston, in sufficiently large groups to obstruct access." *Id*. The Court held that "[f]or a problem shown to arise *only once a week* in one city at *one clinic*, creating 35-foot buffer zones at *every clinic* across the Commonwealth *is hardly a narrowly tailored solution*." *Id*. (emphasis added).

The same holds true here. The Ordinance was adopted to deal with "the untenable and dangerous situation which had begun to develop at [one] site," *i.e.*, the public sidewalk at 40 Engle Street. [Ja284.] And that "dangerous situation" would only take place for a few

hours on one day of the week: Saturday. [Turco Dec., Ja294; O'Keefe Depo., Ja335; Gray Depo., Ja320.]

But the Ordinance does not just apply to that site, nor is it limited to Saturdays. Unlike the Massachusetts law, which applied only to "a place, other than within or upon the grounds of a hospital, where abortions are offered or performed," 134 S. Ct. at 2526, the Ordinance applies *broadly* to both "health care facilities," as defined in N.J.S.A. 26:2H-2, *and* "[c]ommunity residences for the developmentally disabled and community shelters for victims of domestic violence as those terms are defined in N.J.S.A. 40:55D-66.2." [Ja260.]. In other words, the Ordinance does not just apply to a facility where abortions are offered or performed. Nor does it apply solely to the site, *i.e.*, 40 Engle Street, that gave rise to the Ordinance in the first place. It applies, as well, *e.g.*, to "halfway houses" for "mentally ill persons," *see* N.J.S.A. 40:55D-66.2(a), as well as, *e.g.*, bioanalytical laboratories, nursing homes, and rehabilitation centers, *see* N.J.S.A. 26:2H-2. This is not conjectural. Pursuant to the Ordinance, and shortly after it was adopted, city officials began marking out buffer zones at numerous locations in the City, *in addition to* the zones marked at 40 Engle Street. [Ja469-470.]

38

If the Massachusetts law was not narrowly tailored because it authorized buffer zones around numerous reproductive facilities within the state, despite problems only at one facility on one day of the week, *see McCullen*, 134 S. Ct. at 2539, the Ordinance is thus even less tailored than the Massachusetts law.

There is *zero* evidence in the record of congestion, harassment, or violence at any other abortion facility, let alone any transitional or health facilities that do not provide abortions. As the district court correctly observed, "the record is devoid of any evidence of congestion or militant and aggressive protestors congregating outside of other health care and transitional facilities in Englewood." [Ja12.][7]

A regulation of speech is narrowly tailored only "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). Thus, even assuming the dubious proposition that alleged criminal activity at 40 Englewood Street was a problem in need of a solution beyond the enforcement of already existing laws, the Ordinance, which authorizes

---

[7] While the district court notes this fact within the context of its overbreadth discussion, it applies with full force here with respect to the lack of narrow tailoring.

39

no-speech zones within traditional public fora at innumerable locations in Englewood, "is hardly a narrowly tailored solution." *McCullen*, 134 S. Ct. at 2539; *see also Reynolds*, 779 F.3d at 231 ("Given the absence of evidence of a county-wide problem, the county-wide sweep of the Amended Ordinance [banning solicitation within all county roadways] burdens more speech than necessary, just as the statute in *McCullen*—a statewide statute aimed at a problem in one location—burdened more speech than necessary."). Importantly, the Court in *McCullen* noted that the over-inclusiveness of the Massachusetts law was a constitutional impediment for the state, *even if less intrusive laws would have been ineffective. McCullen*, 134 S. Ct. at 2539.

While the City disputes the district court's holding that the Ordinance is facially overbroad, City Br. at 15-18, it does not demonstrate how the breadth of the Ordinance satisfies narrow tailoring under *McCullen*. The Ordinance suppresses speech at numerous locales in addition to 40 Engle Street where there is a complete lack of evidence of the need to do so. *Cf. Bruni*, 824 F.3d at 374 (noting that *McCullen* addressed the breadth of the Massachusetts law "in the context of its free speech analysis and discussion of the

disconnect between the government interests at stake and the means through which it sought to vindicate those interests.").

Thus, *for this reason alone*, the Ordinance substantially burdens more speech than necessary and is therefore unconstitutional as a matter of law.

### 2.     The City's consideration of other jurisdictions

To prove narrow tailoring, the government can demonstrate that it "considered different methods that other jurisdictions have found effective." *Bruni*, 824 F.3d at 371. Here, the only legislation the City considered and adopted to deal with the activities outside MMA was legislation similar to that eventually and unanimously struck down by the Supreme Court. When the City adopted the Ordinance, it was well aware of the *McCullen* case then pending before the Supreme Court. [Ja349-50.] It nonetheless decided not to await the Court's ruling. Had it done so, the City might very well have chosen another course of action, perhaps one suggested by the Supreme Court itself, such as adopting a local FACE ordinance. That was the course of action Massachusetts took after *McCullen*.

41

### 3.   Lack of enforcement and prosecutions under existing laws

The *McCullen* Court pointed out that cities within Massachusetts already had laws on the books that prohibit the obstruction of sidewalks, streets, and highways. 134 S. Ct. at 2538. The Court observed that these laws, "in addition to available generic criminal statutes forbidding assault, breach of the peace, trespass, vandalism, and the like," were examples of the state's "failure to look to less intrusive means of addressing its concerns." *Id*. In addition, the Court noted that a provision of the Massachusetts law not challenged by the *McCullen* plaintiffs subjected to criminal punishment "[a]ny person who knowingly obstructs, detains, hinders, impedes or blocks another person's entry to or exit from a reproductive health care facility." *Id*. at 2537.

Here, with respect to the alleged assault and harassment taking place outside the clinic, New Jersey already punishes these activities as crimes. Subject, of course, to First Amendment limitations, New Jersey law prohibits harassment, N.J.S.A. § 2C:33-4; disorderly conduct, N.J.S.A. § 2C:33-2; and simple and aggravated assault, N.J.S.A. § 2C:12-1. With respect to physically obstructing visitors trying to

42

access the clinic, not only does New Jersey law prohibit the obstruction of public passages, N.J.S.A. § 2C:33-7, the prior ordinance that Englewood amended in 2014 prohibited the obstruction of access to any health or transitional facility. [Ja46.]

Indeed, the most effective way to de-escalate and combat crime is—obviously enough—to arrest and prosecute those who engage in crime. *See Schneider v. State*, 308 U.S. 147, 162 (1939) ("There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets."); *Riley v. National Fed'n of Blind*, 487 U.S. 781, 795 (1988) ("North Carolina has an antifraud law, and we presume that law enforcement officers are ready and able to enforce it."). Suppressing protected speech on a public sidewalk that is unrelated to crime is to apply a sledgehammer to a problem where a scalpel is necessary. *See id.* at 801. ("'Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'") (citation omitted).

Despite laws on the books addressing the alleged criminal activities taking place at 40 Engle Street, the City has not identified *one*

43

*prosecution* of any one person—including members of the very public and vocal Bread of Life group—for violating the previous ordinance (which prohibited obstruction) or *any other law* prohibiting activities such as harassment, disorderly conduct, or simple and aggravated assault at the location of the clinic. The City cannot plausibly maintain that these laws were insufficient to quell the alleged disorderly activities of Bread of Life when it appears that *they were never seriously enforced. See McCullen*, 134 S. Ct. at 2539 (noting that the state could not identify a "single prosecution" brought under the laws the state claimed it tried to enforce). Just as in *McCullen*, the City cannot show that "it seriously undertook to address the problem with less intrusive tools readily available to it." *Id.*

The City implausibly claims, however, that it could not enforce these laws because victims would not file these complaints for fear of reprisal. City Br. at 23-24. This argument, if accepted by courts, would give governments a green light to freely apply broad speech-repressive laws to public sidewalks near any sensitive locations, not just abortion clinics but also furriers and other subjects of controversy. Moreover, if *existing ordinances* could not be enforced, for lack of complaints, how

44

then could an *additional ordinance* (creating buffer zones) be enforced? Why would an individual (patient, escort, doctor, etc.) be more willing to file a complaint with the police about someone crossing a painted line on a sidewalk than about being assaulted? The enforcement mechanism of the Ordinance *is exactly the same:* a complaint brought by a victim or witness to its violation.

In fact, *seven months after the Ordinance was adopted*, it was brought to Algrant's attention that a Bread of Life member stood in the middle of the buffer zone, slammed his sign onto the ground, and said he wouldn't move. [Ja356.] When Algrant was asked, "Can't the law be enforced on its own?" she responded, *"Because no escorts nor patients will file charges there isn't a whole lot we can do."* [Ja357 (emphasis added).] The City thus faced the very same problem *after the Ordinance* that was allegedly the basis for its need in the first place: a lack of complaints.

Nor does the City provide any case law supporting the notion that where laws prohibiting *conduct* could not be enforced, for lack of criminal complaints, a law prohibiting *speech* can somehow be narrowly tailored. *McCullen* instructs: "A painted line on the sidewalk is easy to

enforce, but the prime objective of the First Amendment is not efficiency." *Id*. at 2540.

Additional undisputed evidence contradicts the City's "fear factor" argument. First and foremost, the record contains six official Englewood police investigation reports from 2013 and 2014. [Ja366-74.] Those reports contain complaints about allegedly unlawful protestor behavior made by no fewer than five doctors employed by MMA, two other employees of MMA, and one volunteer clinic escort. Each of the reports contains what one presumes are the complainants' real names and—at least prior to redaction by the City—the victims' addresses. These reports alone contradict the City's rationale as to why existing laws could not be enforced.

In addition, the minutes of the City Council meetings from both October and November 2013 indicate that doctors who worked for MMA addressed these very public gatherings. [Ja103; Ja111; Ja342, Ja345-46.] In fact, the letter submitted at the November 12, 2013 meeting is endorsed by eight individual doctors who were apparently not afraid to publicly identify themselves in this fashion. [Ja345-46.] (That same letter also helpfully directs the City to some of the legal tools readily

available to deal with the problems they describe, including the federal FACE statute.)

Indeed, the City fails to mention that City Council President Algrant assured the clinic volunteer escorts that they need not use their home addresses when filing a complaint but could, instead, simply use the clinic's address. [Gray Depo., 55:16 to 56:3.][8] Two of the police investigation reports, both dated prior to the passage of the Ordinance, identify the "Victim's Home Address" as "40 Engle St." [Ja369, 371.]

The City also fails to mention the suggestion of Bonnie Shapiro, President of Northern NJ NOW, in an October 24, 2014 email to Algrant, that it would be "logical" for the "*clinic itself* to file complaints." [Ja456 (emphasis added).] Shapiro points out that the clinic has "security guards who are there the whole time and can inform the clinic administrator, who can file the complaint . . . on behalf of the clinic." *Id.* Even if patients and volunteer escorts were truly fearful of filing complaints against Bread of Life protestors, the City does not explain

---

[8] This portion of Ashley Gray's testimony was inadvertently not included in the Joint Appendix, but is part of the record in the court below. *See* Deposition of Ashley Gray, Ex. G to Plaintiff's Motion for Summary Judgment, 55:16 to 56:3, ECF Doc. 43-10.

why, as Shapiro suggests, the clinic could not itself file complaints for violations of the law.

Finally, it is odd indeed that the City was able to obtain the complete, voluntary cooperation of Ashley Gray in giving sworn, detailed testimony about the alleged crimes and misdemeanors of the Bread of Life members in this very public litigation, while, at the same time, she is supposed to have been too fearful to give similar testimony in other court venues in support of criminal prosecutions. Other volunteer escorts at 40 Engle Street have publicly identified themselves on social and other media. [Gray Depo., Ja321-23.]

### 4. *Police presence not seriously pursued*

The record is clear that when police were present at 40 Engle Street on Saturday mornings, the rambunctious and allegedly illegal activity at the site would cease. Both the former police chief and Algrant testified that, when police officers were present outside MMA, the alleged misconduct of the Bread of Life members *did not occur*. [O'Keefe Depo., Ja339; Algrant Depo., Ja58-59.]

Despite the admitted effectiveness of this measure—enforcing existing laws through police presence, a more narrowly tailored

approach, under *McCullen*, than suppressing speech in a traditional public forum—the City maintains that limited resources precluded the use of police presence to combat the alleged violence, assaults, and harassment at the clinic. City Br. at 24.

The district court was correct in finding that the City "fail[ed] to provide any reliable documentation or support for [this] assertion." [Ja13.] City Manager, Timothy Dacey, the city official charged with responsibility for the City's budget, admitted that he never bothered to sit down and figure out, in dollars and cents, what it would have cost the City to have increased police presence on Saturdays for only a few hours. [Dacey Depo., Ja361.] Given what the City was told about the unquestioned effectiveness of police presence at the clinic, one would think that *some* sort of cost analysis regarding police presence at the site, or even a back-of-an-envelope scratch calculation, would have been made—not just as a constitutional matter, but for the sake of public safety itself, which was of "paramount concern." [Algrant Cert., Ja80.] If the First Amendment "prevents the government from too readily 'sacrific[ing] speech for efficiency,'" *McCullen*, 134 S. Ct. at 2534-35

(citations omitted), it also prevents the government from sacrificing speech for *inefficiency*.

The City tries to bolster its resources argument by pointing to the police chief's testimony "that the resources that the police could devote to monitoring the site were limited given the fact that the Englewood police have to deal on a daily basis with drive-by shootings, gang violence, narcotics, muggings, and similar crimes." City Br. at 24. [*See* Ja286, "It would have been prohibitively expensive to have a police presence continually at the site whenever it was open."]

The district court did not "reference this sworn testimony" because there was no reason to. *Id.* Not only is Dacey the official in charge of the City's budget—not the police chief—because the Bread of Life group would only show up at 40 Engle Street for a few hours on Saturdays, increased police presence at that site "on a daily basis" would not have been necessary. In fact, the chief testified that, regarding Saturdays, "we could afford one officer for a couple hours for a period of time," although added, without explanation, "it couldn't be an indefinite situation." [O'Keefe Dep., Ja339.]

One need not look far to discover why this approach (increased police presence) was rejected out of hand without serious or reasonable study. When Dacey was asked whether the City had ever undertaken a cost study of assigning a police officer to the scene for three hours on Saturday mornings, he acknowledged that no study was ever done because "[w]e generally will not have taxpayers or police officers to protect a private business." [Dacey Depo., Ja361.]

Keeping the peace on a city-owned, public sidewalk that serves as a traditional public forum for discussion and debate is hardly the equivalent of providing private security service to a business. *See, e.g.,* *Hague v. C.I.O.*, 307 U.S. 496, 515-516 (1939) (since "ancient times," the use of public streets "for purposes of assembly, communicating thoughts between citizens, and discussing public questions" has "been a part of the privileges, immunities, rights, and liberties of citizens."). The City cannot avoid its responsibility to protect the rights of patients and employees of the clinic, the escorts, the sidewalk counselors, and, yes, even aggressive protestors, in a traditional public forum, by claiming that this is a matter of purely private concern for a business. Thus, whether the defense is premised on prohibitive cost (a conclusion for

51

which no documentary evidence was presented) or the alleged private nature of the problem (a conclusion which has no basis in law or common sense), it is certainly insufficient. Moreover, the City cannot say that it "seriously considered" a specific remedy—increased police presence at the clinic—where the City Administrator said flat out, "I wouldn't consider doing that." [Dacey Depo., Ja361.]

### 5.    *No injunctions pursued*

The *McCullen* Court observed that laws such as FACE are not just enforceable through criminal prosecutions, "but also through public and private civil actions for injunctions and other equitable relief." 134 S. Ct. at 2538. The Court stated that it has "previously noted the First Amendment virtues of targeted injunctions as alternatives to broad, prophylactic measures." *Id*. The virtue of injunctive relief is that it "focuses on the *precise individuals* and the *precise conduct* causing a *particular problem*." *Id*. (emphasis added). The Court held that "the [Massachusetts] Act, by contrast, categorically excludes non-exempt individuals from the buffer zones, unnecessarily sweeping in innocent individuals and their speech." *Id*.

Just as in *McCullen*, so too here. The City—or the clinic itself—could have sought an injunction against individuals or groups who have purportedly engaged in unlawful activities, instead of imposing a broad, prophylactic measure that sweeps into its reach the peaceful sidewalk counseling of persons like Turco. Unlike the Ordinance, which categorically bans all non-exempt speech within its zones, injunctive relief in this case would have limited the conduct of bad actors, and allowed the City to achieve its goals of safety and access, while at the same time allowing Turco and others to engage in unencumbered free speech activities.[9]

Clinic volunteer and escort, Ashley Gray, compiled reports for the City detailing the activities of the protestors outside the clinic, which were shared with Algrant and the abortion clinic's legal counsel. [Ja151-52, Ja170-184; Gray Depo., Ja319.] That information could have been used to pursue injunctive relief against those bad actors, but it was instead used to support legislation that squelches the speech of peaceful, law-abiding individuals like Turco. As *McCullen* observed: "If

---

[9] It is telling that seven months *after* passage of the Ordinance, City officials were recommending that the clinic's attorney pursue injunctive relief against the Bread of Life activists whose behavior did not seem to have been mollified much by the Ordinance. [Ja355-57.]

Commonwealth officials can compile an extensive record of obstruction and harassment to support their preferred legislation, we do not see why they cannot do the same to support injunctions and prosecutions against those who might deliberately flout the law." 134 S. Ct. at 2540.

In fact, in both his certification and deposition, O'Keefe testified that an injunction limiting protestors at 40 Engle Street nearly 25 years ago had "calmed" a situation involving "shoving and shouting" and protestors chaining themselves together and bolting shut the clinic's doors. [O'Keefe Cert., Ja211.] Subsequent to that injunction, and until the Bread of Life protestors arrived on the scene in the fall of 2013, "[t]here was no police interaction or intervention at that point because thing[s] ha[d] quelled a bit. There wasn't the same type of friction between the protestors and supporters." [O'Keefe Depo., Ja334.]

It would be one thing if the City or clinic attempted to obtain an injunction against one or more of the Bread of Life members and failed, but try they did not.

In short, the district court was correct in noting that where the City "did not seek injunctive relief against individuals whose conduct

was the impetus for the Ordinance," it could not meet its burden of demonstrating that the Ordinance is narrowly tailored. [Ja13.]

The City's response that that "the fluid nature of the protestor groups at the site and the sporadic nature of the individual acts of harassment and violence at the site" made "identification" an "issue," City Br. at 8-9, is undermined by the numerous reports compiled by the escort leader, Ashley Gray, who testified that she knows many of the names of Bread of Life members. [Ja321.] It is, more critically, not supported with evidence, but rests on mere supposition.

### 6. *Interests of the City and (in)effectiveness of the Ordinance*

Finally, with respect to the Ordinance's lack of narrow tailoring, the City argues that there are "countervailing significant countervailing interests at play here," and that the buffer zones were effective in improving the situation at the clinic. City Br. at 26-27. Neither of these points are relevant to the narrow tailoring analysis under *McCullen* and *Bruni*, where efficiency is *not* the standard.

The issue before this Court is not whether the City's purported interests are substantial in nature. *McCullen*, 134 S. Ct. at 2535. Nor does it even matter that the Ordinance *serves* these interests. City Br.

at 26-27. *McCullen* observed that, although the Massachusetts buffer zones "clearly serve[d]" the interests of ensuring public safety and access to pregnancy-related services, 134 S. Ct. at 2535, Massachusetts should have furthered those interests through more narrowly tailored efforts rather than blanket exclusions of speech in traditional public fora. The City must demonstrate that the buffer zones are *narrowly tailored* to further those interests. The City did not do so at the district court and has not done so here.

It also irrelevant that the Ordinance was allegedly effective in quelling the commotion at 40 Engle Street. A ban on all literature distribution on public streets and sidewalks would not only serve a governmental interest in curtailing litter, it would be, at least to some measure, effective in doing so. But that remedy would hardly be a narrowly tailored solution to combatting a problem with litter. *Schneider*, 308 U.S. at 163 ("[T]he public convenience in respect of cleanliness of the streets does not justify an exertion of the police power which invades the free communication of information and opinion secured by the Constitution.").

For this reason, it does not matter that Turco testified that there "has not been an ongoing violation of the buffer zone" on the part of the Bread of Life protestors. City Br. at 27. Whether these protestors comply with the Ordinance does not change the fact that it substantially impairs Turco's ability to engage effectively in sidewalk counseling. Nor does it change the fact that the City could have pursued a more narrowly tailored approach to address the activities of the protestors than "closing a substantial portion of a traditional public forum to all speakers." *McCullen*, 134 S. Ct. at 2541. While the shouting and signs of the protestors can be effectively communicated across the buffer zones, Turco's manner of speech cannot.

Nonetheless, on this point, the City curiously does not address why Algrant, who spearheaded the passage of the Ordinance, said in response to a complaint about protest activities at 40 Engle Street *seven months after its adoption*, "**[T]he buffer zone doesn't have a lot of teeth as we knew**." [Ja357 (emphasis added).] In fact, Algrant observed in that same email that the protestors "observe the buffer when the cops aren't there then violate [it] when they move on." *Id.*

57

In other words, even seven months after passage of the Ordinance, the City was facing the very same issue it was facing prior to its adoption: a lack of respect for the law on the part of the protestors. And it was also facing the same issue with respect to *remedying* that problem: a lack of police presence. *McCullen* teaches, however, that

> [w]here certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily "sacrific[ing] speech for efficiency."

134 S. Ct. at 2534 (citation omitted).

Taking the path of least resistance, all in the name of (attempted) efficiency, is precisely what the City has done in this case. Instead of focusing on the precise group of individuals causing particular problems at a specific place and time, the City adopted the Ordinance (a virtual copycat of the law unanimously struck down in *McCullen*) that creates speech-censoring zones outside numerous facilities throughout the City. That is not a narrowly tailored remedy to serve *any interests* advanced by the City.

As there are no material facts in dispute, and because the City cannot, as a matter of law, justify the Ordinance as narrowly tailored

under *McCullen* and *Bruni*, this Court should affirm the district court's award of summary judgment to Turco on the grounds that the Ordinance fails intermediate scrutiny.[10]

## II.    The Ordinance is facially overbroad and therefore void.

*Standard of Review*: The district court held that the Ordinance is facially overbroad. That holding is reviewed *de novo*. *See supra*, Sec. I(A).

The Ordinance is not just unconstitutional on account of its lack of narrow tailoring. It is unconstitutional, as well, as being facially overbroad. "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Bruni*, 824 F.3d at 374 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). The overbreadth doctrine prohibits laws that "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964) (internal citations omitted). Accordingly, a law is void

---

[10] The parties agree that Turco's First Amendment freedom of assembly claim and New Jersey state constitutional claim rise or fall based on Turco's First Amendment free speech claim. *See* City Br. 28, n.5. Thus, because Turco is entitled to summary judgment on her free speech claim, she is also entitled to summary judgment on these additional claims.

for overbreadth where it "does not aim specifically at evils within the allowable area of [government] control but . . . sweeps within its ambit other activities that in ordinary circumstances constitute an exercise" of protected rights. *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).

That is precisely the case here. As described previously, the Ordinance does not target the alleged evils that gave rise to it. As the City has admitted, the Ordinance "was enacted to address the untenable and dangerous situation which had begun to develop in 2013 at the site," *i.e.*, the public sidewalk at 40 Engle Street. [Ja284.] Instead of addressing that "dangerous situation" through narrowly tailored means, however, the City adopted the Ordinance, which authorizes no-speech zones in traditional public fora at many locations throughout Englewood. The Ordinance thus "purports to create a virtual 'First Amendment Free Zone'" on public sidewalks not only near facilities that perform abortions, but all health and transitional facilities throughout Englewood. *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 575 (1987). As previously described, those facilities include "halfway houses" for "mentally ill persons," *see* N.J.S.A. 40:55D-66.2(a),

as well as bioanalytical laboratories, nursing homes, and rehabilitation centers, *see* N.J.S.A. 26:2H-2.

Indeed, soon after the Ordinance was adopted, city officials began the process of marking out zones throughout the city. [Ja469-470.] Thus, by painting lines at those and other locations, the City had every intention of enforcing and banning non-exempt speech throughout the City. The City's remark "that the Ordinance has been applied only at the MAA clinic, given the unique history of harassment and violence at this site," City Br. at 17, is belied by the actions of City officials themselves.

Moreover, if there is no "danger" of the Ordinance being applied other than at 40 Engle Street, as the City avers, City Br. at 18 (despite it *actually* being applied elsewhere), then what it is the purpose of the law that, on its face, authorizes buffer zones at scores of locations? Citizens need not rely on the good graces of government officials to apply a broad and sweeping law in a narrow fashion, to dangers that might actually arise. *See Free Speech Coal., Inc. v. AG of the United States*, 677 F.3d 519, 539 n.15 (3d Cir. 2012) (a "facially overbroad law cannot be saved based on the government's a promise by the

government that it will interpret statutory language in a narrow, constitutional manner cannot, without more, save a potentially unconstitutionally overbroad statute"). In fact, in emphasizing what the City claims is the *narrow* scope of the Ordinance in its application, despite its *facially broad* scope, the City all but admits that the Ordinance is not narrowly tailored under *McCullen*. *See supra*, Sec. I(E)(1).

Like the law in *Jews for Jesus*, which banned speech in airports, the Ordinance "does not merely regulate expressive activity . . . that might create problems such as congestion or . . . disruption"; it outlaws all non-exempt speech in many zones on public sidewalks. *Id.* at 574. Even "talking and reading, or the wearing of campaign buttons or symbolic clothing," is banned if one is within a zone and has the purpose of being at that location. *Id.* at 575. These activities "are presumptively protected by the First Amendment but . . . remain subject to the criminal sanctions of" the Ordinance. *Stevens*, 559 U.S. at 481.

Undoubtedly, Englewood may "prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or

engaging in countless other forms of antisocial conduct." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). In furthering these goals, however, the City is required to do so "through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited." *Id.*

*Hill*'s remark that "the comprehensiveness of the statute [was] a virtue, not a vice, because it [was] evidence against there being a discriminatory governmental motive," does not apply here. 530 U.S. at 731. The statute in *Hill* applied to health care facilities, while the Ordinance applies to both health care facilities *and* transitional facilities. [Ja260.] But the City provides no reason, let alone evidence, why buffer zones at transitional facilities, such as "halfway houses" for "mentally ill persons," *see* N.J.S.A. 40:55D-66.2(a), are necessary. Taken to its logical extreme, *Hill*'s observation would encompass a municipal law imposing buffer zones on all places with front doors that adjoin a public sidewalk. While "comprehensive," that would hardly be a legislative "virtue."

It is true that "[i]nvalidation for overbreadth is strong medicine that is not to be casually employed." *ACLU v. Mukasey*, 534 F.3d 181,

206 (3d Cir. 2008) (quoting *United States v. Williams*, 128 S. Ct. 1830, 1828 (2008)). Nonetheless, given the clear and sweeping breadth of the Ordinance, the district court was correct to prescribe that medicine in this case.[11]

Finally, the City's protest that Turco somehow surprised the City with its overbreadth argument in moving for summary judgment is unfounded. City Br. at 18. Turco's verified complaint specifically alleged, in a separate and independent paragraph, that "[t]he Ordinance is significantly overbroad and burdens substantially more speech than is necessary to achieve the City's asserted interests." [Ja275.] The complaint incorporated that paragraph into Count One of the complaint alleging that the Ordinance violates the First Amendment's right to free speech. [Ja276.]

The City points out that the plaintiffs in *Bruni* alleged that the "Ordinance is overbroad on its face and as applied because it prohibits speech and expressive activities at all hospitals and 'health care

---

[11] As Turco suggested to the district court, ECF 43-2, at 37, n.5, should this Court find that the Ordinance is unconstitutional because it is not narrowly tailored to achieve a substantial governmental interest, this Court need not decide whether it is void under the overbreadth doctrine. *See McCullen*, 134 S. Ct. at 2540, n.9; *Bruni*, 824 F.3d at 374.

facilities defined to include many kinds of facilities." City Br. at 18. But that allegation was not part of a separate and distinct "overbreadth count" in the *Bruni* complaint, but an allegation in support of its federal free speech claim. *Bruni*, 2:14-cv-01197 (W.D. Pa.), ECF Doc. 1. The same holds true here.

When the City raised this issue in opposing Turco's motion for summary judgment, the district court correctly held it to be "without merit." [Ja11, n.2.] So too should this Court.

## III.    The City is not entitled to summary judgment.

*Standard of Review*: The district court's decision to deny the City's motion for summary judgment as moot, based on the fact that Turco is entitled to summary judgment on all claims, is reviewed *de novo*. *See supra*, Sec. I(A).

Because, as argued herein, Turco is entitled to summary judgment on her federal and state claims, the City is *not* entitled to summary judgment.

Moreover, the City's claim that Turco's declaration "contradicts" her deposition testimony is incorrect. City Br. at 29, n.6. No specific "contradictions" are cited. In fact, there are none. Turco's declaration

amplifies and explains her deposition testimony about the degree to which the Ordinance compromises her efforts. [Turco Depo., Ja312-13.] Moreover, saying that Turco has been able to continue talking with patients "before and after" passage of the Ordinance [Turco Depo., Ja222-23], does not account for the fact that she can only continue doing so with substantial difficulty, as explained in detail *supra* at Sec. I(C). "[I]t is no answer to say that [Turco] can still be 'seen and heard' by women within the buffer zones." *McCullen*, 134 S. Ct. at 2537. Indeed, Ms. McCullen was still able to sidewalk counsel patients after the Massachusetts abortion zone went into effect, but the Court nonetheless found that the law impaired her ability to do so. *McCullen*, 134 S. Ct. at 2535-36.

The maneuvering, stopping, shifting, catching up, etc. Turco must undertake while navigating the buffer zones' "obstacle course," parked cars, escorts, protestors, and snow banks, is hardly conducive to anything resembling normal communication, let alone "personal, caring, consensual conversations." *Id*. at 2536. Both Turco's declaration and deposition testimony are clear and consistent: the Ordinance

compromises her "ability to initiate the close, personal conversations" that are the core of her sidewalk counseling. *Id.* at 2535.

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted, this 22d day of March 2018.

EDWARD L. WHITE III*
ERIK M. ZIMMERMAN**
AMERICAN CENTER FOR LAW
  AND JUSTICE
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel.: 734-680-8007
Email: ewhite@aclj.org


* Admitted to Third Circuit Bar
** Not admitted in this jurisdiction

s/ Francis J. Manion
FRANCIS J. MANION*
    *Lead Counsel*
GEOFFREY R. SURTEES**
AMERICAN CENTER FOR LAW
  AND JUSTICE
6375 New Hope Road
New Hope, Kentucky 40052
Tel.: 502-549-7020
Email: fmanion@aclj.org

*Counsel for Plaintiff-Appellee*

## COMBINED CERTIFICATIONS

### 1.    Bar Membership

I hereby certify that I am admitted to and a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

### 2.    Word Count

I hereby certify that this brief complies with the type-volume requirements and limitations of Fed. R. App. P. 32(a).  Specifically, this brief contains 12,986 words in 14 point Century Schoolbook font.

### 3.    Certification of Service on Counsel

I hereby certify that on March 22, 2018, I caused a copy of the foregoing Brief of Appellee to be filed and served on the following counsel for Appellant, a Filing User, via the Court's ECF filing system, and 7 hard copies to be sent to the Clerk's office the same day.

Donald A. Klein
Weiner Law Group
629 Parsippany Road
P.O. Box 438
Parsippany, NJ 07054
973-403-1100
dklein@weiner.law

### 4.    Certification of Identical Compliance

I hereby certify that the text of the electronic brief is identical to the text in the paper copies.

### 5.    Certification of Virus Check

I hereby certify that a virus detection program has been run on the file and that no virus was detected. The version of the virus detection program used was Webroot version 9.0.19.43.

s/ Francis J. Manion
FRANCIS J. MANION
AMERICAN CENTER FOR LAW
    AND JUSTICE
6375 New Hope Road
New Hope, Kentucky 40052
Tel.: 502-549-7020
Email: fmanion@aclj.org

*Counsel for Plaintiff-Appellee*

# ADDENDUM

# ADDENDUM A

City Code of Englewood, New Jersey, § 307-3

Mass. Gen. Laws, ch. 266, § 120E1/2 (former)

| City of Englewood Buffer Zone Law | Former Massachusetts Buffer Zone Law |
|---|---|
| (City Code of Englewood, New Jersey, § 307-3) | (Mass. Gen. Laws, ch. 266, § 120E1/2) |
| B. . . . no person shall knowingly enter or remain on a public way or sidewalk adjacent to a health care facility or transitional facility within a radius of eight feet of any portion of an entrance, exit or driveway of such facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of such facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway. This subsection shall not apply to the following: | (b) No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway. This subsection shall not apply to the following: |
| (1) Persons entering or leaving such facility; | (1) persons entering or leaving such facility; |
| (2) Employees or agents of such facility acting within the scope of their employment; | (2) employees or agents of such facility acting within the scope of their employment; |
| (3) Law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and | (3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and |

| | |
|---|---|
| (4) Persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.<br><br>C. The provisions of Subsection B shall only take effect during such facility's business hours and if the area contained within the radius and rectangle described in said Subsection B is clearly marked and posted. | (4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.<br><br> (c) The provisions of subsection(b) shall only take effect during a facility's business hours and if the area contained within the radius and rectangle described in said subsection(b) is clearly marked and posted. |

# ADDENDUM B

Declaration of Jeryl Turco
(Colorized version of Ja290-306)

Francis J. Manion
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax. 502-549-5252
fmanion@aclj.org

Mark R. Scirocco
Legal Center for Defense of Life, Inc.
Law Offices of Robert A. Scirocco
98 Route 46, Suite 6
Budd Lake, New Jersey 07828
Tel. 973-691-1188; Fax 973-691-3353
mark@sciroccoesq.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JERYL TURCO, | Case No. 2:15-cv-03008 |
| Plaintiff, | |
| | Judge Susan D. Wigenton |
| v. | Magistrate Judge Leda D. Wettre |
| CITY OF ENGLEWOOD, NEW JERSEY, | |
| Defendant. | |

## DECLARATION OF JERYL TURCO

I, Jeryl Turco, an adult resident of the State of New Jersey, and Plaintiff in this action, state the following based on my personal knowledge:

1.     I am a Catholic and a volunteer pro-life sidewalk counselor. I have a deeply held religious belief that abortion takes the life of an innocent child and is, therefore, immoral.

2.     I am compelled by my conscience to express my religious views concerning abortion on public sidewalks and venues in Englewood, including on

1

the public sidewalk in front of Metropolitan Medical Associates, located at 40 Engle Street in Englewood (hereafter, "the abortion clinic" or "MMA").

3.      The public sidewalk in front of the abortion clinic is the only location where I can have an effective communicative impact on people going into or leaving the abortion clinic, which is my intended audience.

4.      For over nine years, I have regularly used the public sidewalk in front of and/or adjacent to MMA each Saturday morning to speak with individuals heading to or from the abortion clinic and to offer them literature, rosaries, and information about alternatives to abortion.

5.      I am motivated by my faith to speak with individuals heading to and/or from the abortion clinic in a friendly, peaceful, conversational, and non-confrontational manner.

6.      When using the public sidewalk near MMA, I have been, and desire to continue to be, a sidewalk counselor who extends compassion and assistance to women who are considering, or recovering from, having an abortion.

7.      I consider it essential to maintain a caring demeanor, a calm tone of voice, and eye contact during my exchanges with individuals heading to or from the abortion clinic. I believe that this method of expression is a much more effective means of dissuading women from having abortions than confrontational methods like shouting.

2

8.     Statements I have often said to women who are heading toward the abortion clinic include: "Would you like a rosary?," "Here is some information about fetal development," "God loves you and your baby," "We can help you," "We are praying for you," and "There is a center across the street that can help you" (referring to a crisis pregnancy center located across the street called Our Gift of Hope).

9.     I do not consider myself to be a "protestor" or "demonstrator" when using the public sidewalk near the abortion clinic, as yelling or being confrontational or aggressive would be contrary to, and would interfere with, my intended method of counseling women.

10.     When I use the public sidewalk in front of the abortion clinic, I do not block or obstruct pedestrians using the sidewalk or obstruct entrance to, or exit from, the abortion clinic.

11.     Sometime in the fall of 2013, a group of protestors, associated with a church called the Bread of Life, started to come to the abortion clinic just about every week to protest abortion. I have nothing to do with the Breas of Life group; indeed, I find their methods abhorrent and counter-productive.

12.     Bread of Life demonstrators typically shout at persons entering and leaving the abortion clinic and have, in the past, voiced anti-Catholic statements at

me.  When Bread of Life protestors interfere with my efforts to counsel women, I do my best to ignore them and focus on the women I am there to counsel.

13.    According to my past and continuing experience of going to the public sidewalk in front of MMA every Saturday, Bread of Life protestors show up for a few hours at a time, usually between 8 AM and 11 AM.

14.    In March 2014, the City of Englewood passed an ordinance (hereafter, the "Ordinance") that created buffer zones around the front door of the abortion clinic and the abortion clinic's driveway.

15.    The first set of lines drawn on the sidewalk were white lines drawn approximately eight feet from the sides of the abortion clinic's front door and eight feet from the sides of the abortion clinic's driveway entrance.  Those lines were straight lines from the wall of the abortion clinic to the sidewalk.

16.    Sometime thereafter, yellow lines were drawn on the sidewalk.  Those lines created eight feet arcs from both sides of the abortion clinic's front door and driveway entrances.  Within those arcs are rectangular zones that extend from the sides of the clinic's front doors and driveway entrances all the way to the street.

17.    The white and yellow lines shown in this photograph (attached hereto as Exhibit 1) remain outside the abortion clinic's front door to this day. (At some point, I believe in 2015 or 2016, the yellow arc to the left of the entrance door was

covered over by stone pavement placed by the restaurant next door to MMA. That

arc remains covered up.):



18.    The white and yellow lines shown in this photograph (attached as

Exhibit 2) remain outside the abortion clinic's driveway entrance to this day:



19.    This photograph (attached as Exhibit 3) accurately shows the relationship between the abortion clinic's front door and driveway entrance:



20.    As a result of the Ordinance, I am in effect prohibited from entering, remaining in, or using a large expanse of public sidewalk—approximately 50 to 60 feet in length and encompassing the entire width of the sidewalk—that runs along the entire front of the clinic and part of the adjoining properties, unless I walk through one of the buffer zones (thereby risking being cited for violating the Ordinance) or unless I enter the space between the two zones by walking into Engle Street.

21.    Prior to the enactment of the Ordinance, women would often walk along the public sidewalk in front of nearby buildings, then in front of the abortion

clinic, before entering the clinic, and would take the same route after exiting the clinic.

22.     Prior to the enactment of the Ordinance, I would often have the opportunity to hand literature and a rosary to women who were interested in receiving them, and to engage in discussions in a conversational tone with them, as they walked along the public sidewalk in front of nearby buildings and in front of the abortion clinic.

23.     My counseling efforts have been considerably hampered due to the enactment and enforcement of the Ordinance.

24.     As a result of the enactment of the Ordinance, my ability to engage in peaceful conversations, and to offer literature and/or a rosary to interested individuals passing by on the public sidewalk, has been severely restricted.

25.     In my years of experience in sidewalk counseling in front of MMA, I have come to learn that every second and every inch matters. The longer I have to speak closely and intimately with women, the better chance I have in effectively sharing my message of hope with them.

26.     The Ordinance compromises my ability to initiate the close, personal conversations that I view as essential to sidewalk counseling and also significantly hampers my ability to offer literature and rosaries to individuals on the public sidewalk.

8

27.    Since the enactment of the Ordinance, whenever I have attempted to use public sidewalks located outside of the prohibited area in order to communicate with individuals heading to or from the abortion clinic, there have typically been two or three volunteer "escorts," acting as agents of the clinic, who freely use the area of public sidewalk located inside the outermost boundaries of the painted lines during the clinic's business hours.

28.    These "escorts" have often used various methods to prevent me from having any possibility of engaging in a conversational discussion with individuals heading to or from the clinic, including placing themselves as a physical barrier between the individuals and myself, singing and shouting loudly to drown out the sound of anything I say, and trying to persuade individuals to not accept my literature and rosaries by saying things like "You don't need that," "Don't listen to her," or "She's lying." The "escorts" engage in these activities on the public sidewalk—including within the prohibited area—and also frequently enter and exit the abortion clinic.

29.    These zones have made it very difficult for me to counsel women entering and leaving the abortion clinic. Navigating the various buffer zones painted on the sidewalk at 40 Engle Street is like walking through an obstacle course. I often have to stop walking and speaking closely with a woman because of the painted yellow line.

30.    In the winter, piles of snow alongside the street make it burdensome, if not impossible, for me to walk around the zones to counsel women entering or leaving the abortion clinic.

31.    Engle Street, the one-way street that runs in front of the abortion clinic, is often a busy road.  Not infrequently, cars are parked along the street next to the sidewalk in front of the abortion clinic.

32.    The last time I went to the abortion clinic to engage in sidewalk counseling was on Saturday, April 15, 2017.

33.    Bread of Life protestors were present that day.

34.    The March 2014 Ordinance has not stopped Bread of Life Protestors from shouting at women, holding graphic signs, filming patients, or harassing me because of my Catholic beliefs.

## DECLARATION PURSUANT TO 28 U.S.C. § 1746

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April _18_, 2017

Jeryl Turco

10

**EXHIBIT 1**
**Declaration of Jeryl Turco**

Case 2:15-cv-03008-SDW-LDW    Document 43-7    Filed 04/21/17    Page 13 of 17 PageID: 572



**EXHIBIT 2**
**Declaration of Jeryl Turco**

Case 2:15-cv-03008-SDW-LDW    Document 43-7    Filed 04/21/17    Page 15 of 17 PageID: 574



**EXHIBIT 3**
**Declaration of Jeryl Turco**

Case 2:15-cv-03008-SDW-LDW    Document 43-7    Filed 04/21/17    Page 17 of 17 PageID: 576

